IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SCOTT HEGWOOD,
NASTY HABIT, INC. (a Minnesota
Corporation) and NASTY HABIT, INC.
(a Wisconsin Corporation),

                                                OPINION and ORDER

                    Plaintiffs,
                                                09-cv-350-bbc

          v.

CITY OF EAU CLAIRE, CHIEF JERRY
MATYSIK, DEPUTY CHIEF BRADLEY
VENAAS, RETIRED DEPUTY CHIEF
GARY FOSTER, SGT. CRAIG WEST,
OFFICER DEREK THOMAS, AND ONE
OR MORE JOHN DOES,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          In this civil rights lawsuit, plaintiffs allege that defendants, who include the City of

Eau Claire and various individual active and retired police officers, subjected plaintiffs' bar

to special restrictions and ultimately revoked the bar's liquor license, in violation of

plaintiffs' constitutional rights.  Jurisdiction is present under 28 U.S.C. § 1331.

          Now before the court is defendants' motion to dismiss.  Defendants contend that the

claims must be dismissed for a number of reasons, including claim and issue preclusion, lack

of personal involvement in the violations by the individual defendants, no showing of any basis for the City's liability and failure to establish the elements of each claim.  In addition, the individual defendants contend that they cannot be held liable because they are entitled to qualified immunity.  As I explain below, I will grant defendants' motion with respect to plaintiffs' equal protection claim only with respect to defendant Craig West because plaintiffs' allegations do not even suggest that West was involved in any unfair treatment against the bar at any time within the limitations period.  I will grant the motion with respect to plaintiffs' due process claim as it relates to all the individual defendants because they are entitled to qualified immunity.  Finally, I will grant the motion with respect to plaintiff Hegwood's retaliation claim altogether.   Nothing but speculation supports Hegwood's contention that defendants mistreated him at any time within the limitations period for the statements he made 10 to 20 years ago.  In all other respects, defendants' motion to dismiss will be denied.

From plaintiffs' complaint, I draw the following allegations.


ALLEGATIONS OF FACT

A.  Parties

Two plaintiffs share the same name, Nasty Habit, Inc.   One is a Wisconsin corporation and the other is a Minnesota corporation.  At times relevant to the complaint,

2

these corporations owned and operated a bar in Eau Claire called "The Nasty Habit."  The third plaintiff is Scott Hegwood, who was an agent for both corporations at times relevant to this complaint.

Defendant City of Eau Claire is a municipal corporation and the individual defendants are former and present police officers.  At times relevant to the complaint, defendant Jerry Matysik was the police chief, with the ultimate authority on training and supervision of Eau Claire police officers, and defendant Gary Foster was a deputy chief before he retired.

## B.  Background

From 1983 to 1990, plaintiff Hegwood was a police officer for the Eau Claire police department.  At some point "early" in his career, he witnessed another police officer having sexual relations with a woman in a squad car.  He later told a lieutenant about the activity and, after an investigation, that officer was fired.  The officer was a good friend of defendant Matysik.  Around the same time, plaintiff also saw defendant Matysik "cheating on his wife" in a squad car.

The Nasty Habit bar opened in 1996.  Plaintiff Hegwood's family members had an ownership interest in the bar.  By late 1997, plaintiff's wife was "gifted" an interest in the

bar.  From 1997 on, Hegwood played a major role in operating the bar.  The bar started "becoming one of the most successful bars on Water Street."

Starting in 1998, police officers failed to respond to calls for help from the bar on multiple occasions.  Around the time, Hegwood made a complaint to the police department because he was dissatisfied with the officers' failure to respond appropriately to a call for help for the theft of a neon sign.  Also in 1998, an officer told Hegwood's brother that Hegwood would have a hard time maintaining the bar's success because the officers were "working against" the bar.

Later that year, after he called the police for help and the responding officer pushed him, Hegwood made another complaint to the police department.  The officer was required to participate in an anger management program.  After Hegwood made that complaint, defendant West ticketed him for having patrons in the bar two minutes after closing one evening.

## C.  The City's and Officers' Treatment of the Bar

Starting in 2005, Hegwood started hearing that the City of Eau Claire intended to shut down the bar.  In addition, police officers told Hegwood that defendant Foster was "out to get" Hegwood, that the "department" was "going after" the bar and that defendant West "had it out" for Hegwood.  In August of that year, the City refused to reissue a bartending

license to a bartender at the Nasty Habit on the ground that he had a disorderly conduct charge that year, and on the same day the City granted a bartending license to a woman with two felonies.

In September 2005, Hegwood met with defendant Venaas and other police officers and the city attorney.  The city officials told Hegwood that it was "concerned" about the bar and suggested that Hegwood alter his policies.  Their suggestions included requiring uniforms, training employees on when to call the police, disallowing drinking by employees, getting rid of a "dance box" at the bar, prohibiting over-serving patrons, prohibiting bartenders from serving "last call" shots and requiring bouncers to use clickers.  Hegwood agreed with the City's "directives" because he wanted to avoid revocation proceedings.  At any rate, Hegwood already required uniforms, trained his employees, prohibited over-serving and required clickers.

Hegwood called Venaas six times for training about how the bar should be operated. Venaas never responded.  Eau Claire police officers, including Venaas, had offered this type of training service to other bars, such as the "Pioneer" and "SheNannigans," but did not grant Hegwood's request.  A number of the "suggestions" were restrictions not required of other bars.  For example, it was common practice in the city for tavern employees to have a couple of drinks while working and for tavern employees to serve a last drink at "last call," but no other tavern was required to curtail this practice.  There was no record of sexual

5

assaults documented at the Nasty Habit but there were such assaults documented at other bars, including SheNannigans and Brat Kabin, but only the Nasty Habit was required to remove its "dance box."

On January 7, 2006, after an employee of the Nasty Habit asked an officer whether he could make a police report after he had been punched by a patron. The police officer told the employee he had no credibility. He handed out only one report although multiple witnesses wanted to submit reports.

On January 14, 2006, an officer walked into the Nasty Habit after bar closing and insisted everyone open their shirts and coats to show him their employee t-shirt. The police did not demand shirt disclosure of other bars.

On January 23, 2006, a patron from the bar had to be taken by the police to detox. The patron was served only one drink at the Nasty Habit, and that drink was taken away from him when it became obvious that he was intoxicated. Defendant Thomas sent the patron to detox. Ten days later, defendant Thomas interviewed a bouncer from a different bar, SheNannigans, about the incident. The bouncer gave a less than accurate statement because Thomas told the bouncer that they were worried the intoxicated patron might sue the City. After the bouncer found out the statement would be used against the Nasty Habit, he recanted, preparing a new statement.

In February and March 2006, Nasty Habit employees called the police for help but the police did not respond.  Eau Claire officers usually responded to calls for help by other taverns and offered help where needed.

### D. Revocation Proceedings

On March 1, 2006, the City of Eau Claire issued a Summons and Complaint seeking revocation or suspension of the bar's liquor license.  The city attorney and defendant Matysik filed the complaint, alleging that Hegwood's employees kept a "disorderly house" pursuant to § 125.12(2)(ag)2

The patron and safety problems the Nasty Habit had experienced were either comparable to those of other bars in the area or fewer.  The complaint alleged that underage patrons had been found in the bar and that the bar had become a "threat to the public" because, among other things, on January 23 a patron had to be taken to detox by the police and because drunken patrons had engaged in brawls.  However, other bars in the area had similar or worse problems.  For example, Brothers, SheNannigans and the Pioneer had higher numbers of underage patrons during that time period; Brothers, Erberts & Gerberts, the Brat Kabin and SheNannigans had the same or more detox admissions and Brat Kabin had a much more serious incident (a beating of a man outside the bar).  Other bars had problems as well, including a death from acute alcohol intoxication at Camaraderie in 1994 and

7

disorderly behavior outside the Grand Illusion bar in 2006 after a man ripped up a ticket he had received for carrying a drink out of the bar and screamed at the officers.  The area in general had problems, with 101 battery cases, including a stabbing, a rifle threat, shots fired, battery to officers and a sexual assault in a well-lit parking lot between January 2004 and April 2005.

Some bars, such as the Pioneer, had incidents so severe that they had their license suspended multiple times.  None of these bars had their licenses revoked.  Before revocation proceedings were brought against the Nasty Habit, the bar had never had its liquor license suspended or otherwise been convicted of violating Chapter 125 of the Wisconsin Statutes.  The eight incidents named in the complaint supporting revocation are incidents that are commonplace at most taverns.  Some of the incidents listed included incidents in which the police charged Nasty Habit bouncers with disorderly conduct for doing their jobs as bouncers, but did not issue charges to bouncers at other taverns for the same type of activity.

The president of the local tavern league to which the Nasty Habit belonged stated that she would "not take sides" in the revocation, but she ended up testifying against Hegwood at the revocation hearing.  After that testimony, she was granted two large special event licenses from the City.

After the hearing, on June 19, 2006, the City's Administrative Review Board voted 3 to 2 to revoke the Nasty Habit's liquor license.  The City Council for the City upheld the

8

Board's determination on June 27, 2006.  That month, the Nasty Habit, Inc. filed a statutory appeal from the revocation to the state circuit court.  The parties settled on appeal.  Plaintiffs agreed to dismissal on the merits of the revocation appeal on the ground that the bar's successor would have a license.  The purchase of the license cost the Nasty Habit $10,600.  Plaintiffs sold the bar to the new licensee.

OPINION

A.  Equal Protection

Defendants seek dismissal of plaintiffs' equal protection claim on the grounds that plaintiffs' allegations do not establish that plaintiff was treated differently from "similarly situated" entities or overcome a presumption of rationality applicable to "class of one" equal protection claims such as plaintiffs'.  Plaintiffs allege that defendants imposed special requirements on the Nasty Habit, failed to offer training to its employees, failed to provide police services to the bar and its workers on multiple occasions, performed a one-sided investigation of an incident involving the bar, ticketed the bar for minor incidents and brought an action to revoke the bar's license and ultimately decided to revoke it.  According to plaintiffs, other bars in the City with similar or worse patron and safety problems were not subjected to the same negative treatment by the police department.

9

Although defendants contend that "similarly situated individuals must be very similar indeed," Defs.' Br., dkt. #20, at 5, they point to only one case, in which the court was evaluating the facts in the record at summary judgment. At this early stage, plaintiffs are not required to set forth specific facts identifying all the "factual traits, circumstantial nuances, and peculiarities," between the bars to overcome any doubt that the bars are not "similarly situated." Id. at 5. At the pleading stage, allegations that other bars in the same city had similar patron and safety problems are sufficient to allow an inference to be drawn that the bars are truly similarly situated. Only at summary judgment or trial will plaintiffs be required to come forward with specific facts detailing the similarities between the bars.

Next, defendants contend that the allegations do not overcome the presumption of rationality, pointing out that allegations of animus alone do not overcome that presumption. Flying J Inc. v. City of New Haven, 549 F.3d 538, 546 (7th Cir. 2008); Lauth v. McCollum, 424 F.3d 631, 634 (7th Cir. 2005). However, plaintiffs' allegations do mor than simply identify animus; they describe a course of treatment by defendants properly characterized as "singling out" of plaintiffs. These allegations overcome any presumption of rationality. Engquist v. Oregon Dept. of Agriculture, 128 S. Ct. 2146, 2153 (2008) ("[W]hen it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised . . . . This differential treatment raised a concern of arbitrary classification [requiring] the State to provide a rational basis for it.").

10

This case is much like <u>Hanes v. Zurick</u>, 578 F.3d 491, 493-94 (7th Cir. 2009), a case in which the court of appeals concluded that the plaintiffs' allegations were sufficient to state a claim for "class of one" unequal enforcement.  In that case, the plaintiff alleged that police consistently treated him worse than his neighbor when responding to complaints from either one of them regarding a long-running dispute between the two.  In addition, the plaintiff alleged that the reason for the disparate treatment was that the police  "hated" him and "did not respect him," reasons "unrelated to the police officers' duties." <u>Id.</u>  In this case, plaintiffs allege that defendants imposed a number of restrictions and sanctions on the Nasty Habit that they did not impose on any of the other, similarly situated bars, including revocation of its license.  Moreover, plaintiffs allege that this unfair treatment was fueled by the personal animus of defendants Chief Matysik and retired Deputy Chief Foster "unrelated to the police officers' duties."

Defendants contend that plaintiffs do not allege facts showing personal involvement by each defendant in the violation.  However, it is plausible to infer that each individual defendant except defendant West had a hand in imposing restrictions on the bar and treating plaintiffs unfairly.  Plaintiffs allege that in 2005, Hegwood met with city officials about their "concern" with the bar and the officials made "suggestions" restricting the bar that plaintiffs felt compelled to comply with.  After that, plaintiffs contacted defendant Venaas six times to receive training that the police offered other bars, but were ignored.  In

11

2006, defendant Thomas performed a one-sided investigation of an incident that was used against the bar.  Numerous unnamed police officers failed to respond to plaintiffs' requests for assistance at the bar.  Moreover, defendant Matysik signed the complaint seeking revocation of the bar's license.

The complaint ties defendants' activities to the alleged equal protection violations and describes the roles of defendants Foster and Matysik, if only tenuously, by alleging facts that make it plausible to infer that these defendants directed the unfair treatment of the other officers out of animus.  In particular, plaintiffs allege that defendants Foster and Matysik were in supervisory positions, that a number of officers told Hegwood that Foster and the "department" were out to "get" plaintiffs after Hegwood complained about the police services and that defendant Matysik had reasons to dislike Hegwood related to Hegwood's previous actions as a police officer.

Defendant West is a different case.  West's name comes up twice: once in an allegation that he ticketed Hegwood in 1998 for having patrons in his bar after Hegwood made a complaint to the police.  As defendants point out, actions occurring before June 3, 2003 cannot give rise to a claim because that date marks the cutoff for the statute of limitations in this case.  Plaintiffs respond that the pre-2003 allegations are for background, but the only other mention of West is that, in 2005, an officer told plaintiff Hegwood that West "had it out for" Hegwood.  Nothing suggests that West ever acted on his animus for

Hegwood after 1998 or was otherwise involved in the other officers' bad acts, so plaintiffs' equal protection claim against West must be dismissed for West's lack of personal involvement.

The individual defendants make one additional attempt to escape liability on this claim, by arguing that they are qualifiedly immune.  However, as the court of appeals acknowledged recently in <u>Hanes</u>, 578 F.3d at 496, it has been clearly established since 2000 that individuals have the "right to police protection uncorrupted by personal animus." <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000); <u>Hilton v. City of Wheeling</u>, 209 F.3d 1005 (7th Cir. 2000).  At this early stage, it is plaintiffs' complaint that governs. Drawing all inferences from the complaint in plaintiffs' favor, I find that plaintiffs have alleged that all the individual defendants other than West were involved in singling out plaintiffs' bar because of personal animus.  Defendants are not entitled to qualified immunity under that set of facts.

## B. Due Process

Plaintiffs assert a due process claim on the ground that Wisconsin's "disorderly house" statute, Wis. Stat. §§ 125.12(2)(ag)2, is unconstitutionally vague and that defendants relied on that statute to revoke the Nasty Habit's liquor license.  Defendants contend that this claim fails as either "moot" or barred by claim preclusion and that the

13

individual defendants are protected from a suit for damages on the basis of qualified immunity.

The "mootness" argument and the claim preclusion argument relate to the fact that plaintiffs have already challenged the license revocation once, in state court. Specifically, plaintiffs Hegwood and Nasty Habit, Inc. (it is not clear whether it was the Minnesota Nasty Habit corporation or the Wisconsin one) brought an action under Wis. Stat. § 125.12(2)(d), which allows a state circuit court to review a municipal body's decision to revoke a liquor license. In that action, plaintiffs challenged the revocation and contended that the statutes underlying the revocation were "unconstitutionally vague, overbroad and ambiguous" and their application violated their due process and equal protection rights. Certified State Court Records for Nasty Habit Inc. v. City of Eau Claire, 06-cv-390, dkt. #5, at 6. The relief plaintiffs requested included a new trial reviewing the license revocation, reversal of the decisions of the municipal body and a declaratory judgment that the statutes underlying the revocation are unconstitutional.

Before the circuit court could decide the dispute, the parties settled and submitted a stipulation and order for dismissal. Id. at 9. In accordance with the parties' stipulation, the judge  dismissed plaintiffs' "appeal pursuant to Wis. Stat. § 125.12(2)(d) of the City Council's decision to revoke Plaintiffs' liquor license and not reissue a license for twelve (12) months . . . on the merits and without cost to any party" and dismissed plaintiffs' "remaining

14

claims without prejudice." Id. at 11.  As part of the parties' agreement, plaintiff was able to obtain a license for someone else, who purchased the bar.

Defendants' mootness argument is that plaintiffs' opportunity to challenge the license revocation has come and gone; they cannot hope to undo their revocation now that they have sold the bar.  Defendants overlook the fact that, if defendants violated plaintiffs' constitutional rights, plaintiffs may still seek damages for that violation, regardless whether they can seek to undo the revocation itself.

Defendants' claim preclusion argument is a closer question.  Plaintiffs' challenge to the revocation suit was dismissed "on the merits" under the parties' stipulation.  According to defendants, that dismissal bars plaintiffs' due process claims, which inherently involve challenges to the revocation.

A court should not apply claim preclusion if the original judgment was not "a final judgment on the merits in a court of competent jurisdiction."  Wickenhauser v. Lehtinen, 2007 WI 82, ¶ 22, 302 Wis. 2d 41, 734 N.W.2d 855.  (The matters of claim and issue preclusion in this case are governed by Wisconsin law, as the parties agree, because a Wisconsin court decided the original matter and federal courts are to "give preclusive effect to state-court judgments whenever the courts of the state from which the judgments emerged would do so."  Allen v. McCurry, 449 U.S. 90, 96 (1980).)  Claims dismissed without prejudice are not generally considered "on the merits" because a party remains "free to refile

15

the same [claims] to obtain a judgment on their merits." <u>State v. Miller</u>, 2004 WI App 117, ¶ 27, 274 Wis. 2d 471, 683 N.W.2d 485.

The flaw in defendants' claim preclusion argument lies in the language of the state court's dismissal order.  Regardless whether plaintiffs brought, or could have brought, their due process claim (and their other claims, for that matter) in the state court proceeding, the court separated its dismissal of the claims into two types: "on the merits," which applied only to plaintiffs' appeal of the revocation itself, and "without prejudice," which applied to the "remaining claims."

Defendants suggest that the "appeal" of the revocation included all plaintiffs' grounds for challenging the revocation, including the due process challenge.  However, the context in which the court dismissed the "appeal" and the "remaining claims" on different grounds makes it clear that "appeal" cannot encompass all plaintiffs' grounds for appealing the revocation.  All that was at issue in the case were the revocation itself and the request for a declaratory judgment challenging the statutes underlying the revocation.  If the "appeal" encompassed all plaintiffs' grounds for challenging revocation, it would thus include the declaratory judgment action, making surplusage of the language dismissing "remaining claims" "without prejudice."  <u>In re Estate of Flejter</u>, 2000 WI App 26, ¶ 28, 240 Wis. 2d 401, 623 N.W.2d 552 (ambiguous judgment should be construed in light of record and

16

preferably in way that gives reasonable meaning to all provisions rather than in way that leaves part of language useless or inexplicable or surplusage).

The state circuit court did not dismiss any of the claims currently before this court "on the merits."  To the extent defendants are suggesting that the due process claim could still be barred under claim preclusion as a claim that "should have been" pursued in the original lawsuit, I disagree.  The court's decision to preserve certain claims by dismissing them "without prejudice" protects plaintiffs from later preclusion as to those claims.  State v. Miller, 2004 WI App 117, ¶ 27, 274 Wis. 2d 471, 683 N.W.2d 485 (parties remain free to refile claims dismissed without prejudice); see also Matter of Energy Co-op., Inc., 814 F.2d 1226, 1233 (7th Cir. 1987) (citing Restatement (Second) of Judgments § 26(1)(b), cmt. b (1982)) (claim preclusion does not bar a claim that court "reserves for later resolution" regardless whether the issue "might otherwise have been adjudicated" in original suit).  Because the court narrowed its dismissal "on the merits" to the appeal of the revocation itself, plaintiffs' related claims are not barred under the doctrine of claim preclusion.

This leaves the individual defendants' qualified immunity argument.  In response to this argument, plaintiffs point to a single appellate case to support their position that it was clearly established that "enforcing an unconstitutionally vague statute against a plaintiff would violate the Constitution," and that "disorderly house statutes are unconstitutionally

17

vague." Dkt. #17, at 26 (citing <u>Foster v. Zeeko</u>, 540 F.2d 1310 (7th Cir. 1976)).  In <u>Foster</u>, 540 F.2d at 1313, the Seventh Circuit reversed a lower court's finding of qualified immunity on the question whether Chicago police officers could be held liable for "purporting to enforce [a disorderly house] ordinance which itself had not been declared invalid at the time."  The court noted that an Illinois statute similar to the ordinance (also containing the word "orderly") had been struck down shortly before and that other ordinances dealing with "vagrancy" had been struck down around the same time, but also that the ordinance itself had been upheld years before.  <u>Id.</u> at 1315-17.  After making these points and listing other "factors," the court concluded that it was not appropriate to decide the question of qualified immunity on the record before it.  <u>Id.</u>

<u>Foster</u> does not do all that plaintiff needs it to do, which is to establish that a reasonable police officer would have understood that enforcing *Wisconsin's* disorderly house statute would be unconstitutional.  <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). Although it is not necessary for pre-existing law to have established that the very action being challenged is unlawful, the law should make the unlawfulness of the action apparent. <u>Id.</u>  <u>Foster</u> establishes the point that it is possible for officials to be held liable for applying vague disorderly house statutes even before the statute is officially struck down; it does not establish that Wisconsin's disorderly house statute is vague.

18

The only other cases plaintiffs cite are a district court case, <u>McTavish v. Spiotto</u>, 500 F. Supp. 703 (N.D. Ill. 1980), and a state court case, <u>Warren v. State</u>, 572 So. 2d 1376 (Fla. 1991), neither of which is controlling.  <u>Anderson v. Romero</u>, 72 F.3d 518, 525 (7th Cir. 1995) ("Taken together with other evidence, [district court opinions] might show that the law had been clearly established," but because they have no weight as precedent, individually they "cannot *clearly* establish a constitutional violation.").  Additionally, these two cases alone are not enough to establish the kind of clear trend that would put defendants on fair notice that their conduct was unconstitutional.  <u>Jacobs v. City of Chicago</u>, 215 F.3d 758, 767 (7th Cir. 2000).

At any rate, neither case makes it apparent that Wisconsin's disorderly house statute is vague.  In <u>McTavish</u>, 500 F. Supp. 703, the court simply points to the district court case underlying <u>Foster</u>, in which the court found vague the Illinois statute related to "common, ill-governed, or disorderly house, room or other premises kept for the encouragement of idleness, gaming, drinking, fornication, or other misbehavior."  <u>Foster</u>, 540 F.2d at 1311 (quoting ordinance).  In <u>Warren</u>, 572 So. 2d at 1376-77, the court found that a statute prohibiting houses "of ill fame, resorted to for the purpose of prostitution or lewdness" was vague, in particular because of the phrase "ill fame."  The Wisconsin "disorderly house" statute involves a "disorderly or riotous, indecent or improper house."  Plaintiffs do not

19

explain how the case law they cite would have made it apparent to a government official that it was unconstitutional to apply the Wisconsin statute.

In short, plaintiffs have failed to meet their burden.  Mannoia v. Farrow, 476 F.3d 453, 457 (7th Cir. 2007) (once defendant raises qualified immunity defense, plaintiff has burden to show that it should not apply).  Perhaps plaintiffs' cite to Foster was meant to encourage the court to follow Foster in avoiding a decision on the question of qualified immunity until the issues had been better developed.  That is not the favored approach these days.  As the Supreme Court has said repeatedly, qualified immunity is "an immunity from suit rather than a mere defense to liability," a protection that "is effectively lost if a case is erroneously permitted to go to trial."  Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  That same rationale applies to cases that are erroneously permitted to proceed through discovery.  Because plaintiffs have failed to show that it was "clearly established" that applying Wisconsin's disorderly house statute would be unconstitutional, I conclude that the individual defendants have qualified immunity with respect to plaintiffs' due process claim and will grant defendants' motion to dismiss that claim against the individual defendants.  (Although qualified immunity protects these defendants only from a suit for damages, that is the only relief plaintiffs are seeking.)

### C. First Amendment

Finally, plaintiff Hegwood asserts retaliation claims, contending that defendants treated the Nasty Habit unequally because plaintiff Hegwood made complaints to the police department and made statements about police officers' misconduct.  Defendants' first argument is that the retaliation claim is barred by issue preclusion.  They point to plaintiffs' revocation appeal, which was dismissed on the merits.  This matter can be resolved quickly. Issue preclusion applies only if an issue "actually has been litigated and is necessary to the judgment."  Mrozek v. Intra Financial Corp., 2005 WI 73, ¶ 17, 281 Wis. 2d 448, 699 N.W.2d 54.  Whether defendants retaliated against Hegwood was neither actually litigated in the prior proceeding nor was it necessary to the final judgment dismissing the appeal of the license revocation.

Next, defendants challenge the merits.  Defendants concede that the complaint identifies "protected speech" by plaintiff Hegwood, Defs.' Br., dkt. #20, at 2.  In particular, plaintiffs allege that (1) at some point "early" in Hegwood's career as a police officer (which lasted from 1983 to 1990), plaintiff told a lieutenant that he had witnessed a fellow police officer having sexual relations with a "woman other than [that officer's] wife in his squad car," which led to the officer's termination; (2) in 1998 or 1999, Hegwood complained to the police department about its failure to respond appropriately to a call for help regarding the theft of the Nasty Habit's neon sign; and (3) in 1998, Hegwood complained to the police

21

department about an officer's inappropriate and assaultive behavior toward Hegwood, which led to discipline for the officer.

However, defendants contend that plaintiffs cannot meet the next two requirements of a First Amendment retaliation claim, that defendants engaged in adverse actions that would deter a person of ordinary firmness in Hegwood's position and that Hegwood's speech was one of the reasons defendants' took those actions. E.g., Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). Defendants' alleged adverse actions are the actions described above in the context of the equal protection and due process claims: imposition of stricter restrictions and harsher sanctions on the Nasty Habit than those imposed on similar bars. Defendants do not suggest that these actions would not be adverse to the owners of the bar, but point out that Hegwood did not own the bar. Nonetheless, if plaintiffs are correct, Hegwood's interest in the bar was real. According to plaintiffs, Hegwood's wife owned the bar; presumably, plaintiff enjoyed an interest in the bar as a result of Wisconsin's Marital Property law, which makes spousal half-ownership the default. (It is possible that Hegwood really did not have an interest in the bar; under Marital Property law, gifts are often excluded. Nonetheless, defendants do not deny that Hegwood had a marital property interest in the bar.) Defendants' only response is that their actions, especially the revocation, were "directed toward the license holder," not plaintiff or even the individual owners of the corporation holding the license. That would not be a proper inference to draw

22

at this stage, but even if it were, proof of the second element of the First Amendment question requires only a showing that the actions would deter a person of ordinary firmness in Hegwood's position.  A person with marital property interest in a bar threatened with competitive disadvantages and ultimately with the loss of its liquor license would be deterred.  Cf. Bridges, 557 F.3d at 552 (together, kicking prisoner's cell door, turning his cell light off and on, opening cell trap and slamming it shut when prisoner was sleeping, making unjustified disciplinary charges and improperly dismissing his grievances were sufficient to deter person of ordinary firmness).

Defendants' causation argument is better.  As defendants point out, a long time has passed since plaintiff Hegwood made his complaints and statements and the mistreatment he alleges.  The protected speech are 10- and 20-year-old statements.  Although plaintiffs are correct that, at this early stage, it is not necessary for plaintiffs to prove their case, or even plead every fact, their "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Plaintiffs' allegations fall short.  True, plaintiffs include allegations suggesting that certain police officers were "out to get" Hegwood:  Hegwood was a former police officer who made statements about another officer in the 1980s, who may have been a friend of Chief Matysik; Hegwood started having problems with the police shortly after he started playing a "major role" in the operation of the bar in 1997; and he was told on a number of occasions

23

that the "police department" or certain individuals in the department were "out to get" him and the bar.  But what ground is there for thinking that plaintiff's 10- and 20-year-old statements were the reason for this animosity?  The only thing plaintiffs mention that could be said to relate his protected speech to his unfair treatment occurred in 1998, when police "increased the harassment of and discrimination" against the bar, the only example of this being defendant West's decision to ticket Hegwood for having patrons in the bar two minutes after closing.  Regardless whether this action could be considered retaliatory, it occurred beyond the limitations period and is nothing more than "background," as plaintiffs concede.

With respect to the unfair treatment of the bar that occurred within the limitations period, nothing but speculation ties these long-gone statements to unfair treatment of the bar; under <u>Twombly</u>, that is not enough.  Therefore, I will grant defendants' motion to dismiss plaintiffs' First Amendment claim.

### D.  <u>Municipal Liability</u>

Aside from their general arguments on the merits, defendants contend that plaintiffs have failed to establish municipal liability against the City of Eau Claire under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).  A city can be held liable for the alleged constitutional violations only if that violation is caused by the City's own policy or

custom.  Walker v. Sheahan, 526 F.3d 973, 977 (7th Cir. 2008) (citations omitted).  The

City's responsibility can be shown if, for example, the act derives from the municipality's

legislative body, Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986), or from an

official responsible for establishing final government policy respecting the act taken.  Id. at

482-83.  These requirements are met here because plaintiff alleges that the municipal body

itself revoked the bar's license, a decision that plaintiffs contend relied on an

unconstitutionally vague statute and was different from the treatment afforded other

similarly situated bars.  Moreover, the remaining acts are alleged to have emanated from

defendant Matysik, who plaintiffs allege had final policymaking authority relating to the

behavior of the officers and who directed the officers to mistreat plaintiffs.  Therefore,

defendant City of Eau Claire must remain in the case.


ORDER

    IT IS ORDERED that

    1.  The motion to dismiss filed by defendants City of Eau Claire, Jerry Matysik,

Bradley Venaas, Gary Foster, Craig West, Derek Thomas and one or more John Does, dkt.

#3, is GRANTED in part and DENIED in part.  The motion is GRANTED with respect to:

        a.  plaintiffs' claim that defendant West violated plaintiffs' equal protection

        rights;

25

   b. plaintiffs' claim that defendants Matysik, Venaas, Foster, West, Thomas and one or more John Does violated plaintiffs' due process rights; and

   c. plaintiff Hegwood's claim that defendants retaliated against him in violation of plaintiff's First Amendment rights.

The motion is DENIED in all other respects.

  2. Plaintiffs' complaint is DISMISSED as to plaintiffs' claims against defendant West.

  Entered this 10th day of November, 2009.

       BY THE COURT:

       /s/

       _____

       BARBARA B. CRABB
       District Judge